UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

GREEN HILLS DEVELOPMENT                                    PLAINTIFFS
COMPANY, LLC, AND DELL
GROUP HOLDINGS, LLC

V.                                          CIVIL ACTION NO. 3:19-CV-416-DPJ-FKB

OPPENHEIMER FUNDS, INC.,                                   DEFENDANTS
D/B/A OPPENHEIMER
ROCHESTER HIGH YIELD
MUNICIPAL FUND, ET AL.

ORDER

This case is before the Court on a third set of motions to dismiss under Federal Rule of

Civil Procedure 12, these filed under Rule 12(b)(6) by newly added Counterclaim Defendant Ben

O. Turnage, Jr.  *See* Mots. [113, 117, 119].  The dispute involves highly complicated facts and,

in some instances, fuzzy legal precedent.  While the Court appreciates the difficult task the

parties faced in briefing these issues, it is left with unanswered questions that will eventually

require greater clarity and detailed briefing.  But on this record, and under the Rule 12(b)(6)

standard, the Court concludes that the counterclaims have been plausibly stated.  Thus,

Turnage's motions to dismiss are denied.

I.      Facts and Procedural History[1]

In 2007, the Rankin County Board of Supervisors created the Stonebridge Public

Improvement District (Stonebridge PID) to manage and finance public improvement services for

---

[1] Although this is the Court's third opportunity to visit the factual allegations, it restates them
here for context.  In this instance, the facts are drawn from the counterclaims filed by
Oppenheimer Funds, Inc.; UMB Bank, N.A.; Stonebridge Holdings I, LLC; Stonebridge
Holdings II, LLC; and Stonebridge Holdings III, LLC ("Counterclaim Plaintiffs").  Finally,
while there are other Stonebridge Holdings LLCs, this Order refers to the three Counterclaim
Plaintiff LLCs as the "Stonebridge LLCs."

property located within Stonebridge, a newly established development.  The board took this action in response to a petition filed by Plaintiff Green Hills Development Company, LLC, and signed by its manager, newly added Counterclaim Defendant Turnage.  Green Hills was the developer and, at that time, owned most of the property in Stonebridge.

In September 2007, Stonebridge PID's board issued bonds through a Trust Indenture under which Defendant UMB Bank ultimately became the Successor Trustee.  Green Hills and Plaintiff Dell Group Holdings, LLC, allege that Oppenheimer Funds, Inc., was and remains the majority bondholder.[2]  Stonebridge PID assigned the bond proceeds to the Trustee, including Special Assessments levied as taxes against landowners in the Stonebridge development.

Problems arose when Green Hills—which owned most of the lots—failed to pay the Special Assessments due on its Stonebridge property.  This failure to pay ultimately resulted in Green Hills' residential and commercial lots in the development being "struck off to the state of Mississippi" in 2009 and 2010.  State Ct. R. [1-1] at 12, Compl. ¶ 3.12.  Green Hills retained a statutory right of redemption but declined to exercise that right.  Miss. Code Ann. § 27-45-3.  As a result, Counterclaim Plaintiffs aver that "Green Hills did not own *any* property in the Stonebridge [d]evelopment for the period of September 1, 2010, to March 10, 2016."  Oppenheimer Am. Ans. [62] at 25, Counterclaim ¶ 2.17 (emphasis added).

Moving ahead to 2015, UMB Bank, as Successor Trustee, created the Stonebridge LLCs "as assets of the trust estate established by the Trust Indenture."  *Id.* at 27, Counterclaim ¶ 2.24.

---

[2] There is some dispute about whether Plaintiffs sued the correct Oppenheimer entity. Oppenheimer says "[t]he correct defendant is Invesco Oppenheimer Rochester High Yield Municipal Fund."  Oppenheimer Am. Ans. [62] at 1.  For ease of reference, the Court refers to this party as Oppenheimer, noting at this point that Invesco is not technically a party.

The sole purpose of these LLCs was to "purchase[], maintain[], market[] and sell[] the [Stonebridge property] for the benefit of the . . . [b]ondholders." *Id.*

The Stonebridge LLCs sought approval for the purchase of the struck-off property in a Minnesota state court. *Id.* at 27, Counterclaim ¶ 2.25. Green Hills and Turnage were notified but failed to object, so on August 6, 2015, the Minnesota court allowed the Stonebridge LLCs to purchase the properties that had been struck off. *Id.* at 28–29, Counterclaim ¶ 2.29. The Stonebridge LLCs then applied to purchase the properties from the Mississippi Secretary of State and were awarded ownership in June and July 2016.

Green Hills filed its first lawsuit regarding these dealings in Rankin County Chancery Court in July 2016 (the 2016 Lawsuit), challenging the validity of the Stonebridge LLCs' purchases. The chancellor dismissed the 2016 Lawsuit at the summary-judgment stage, and the Mississippi Supreme Court affirmed in part. The appellate court agreed that, because Green Hills had received notice of its default as to the Special Assessments and had an opportunity to file an application to retain its ownership interest, the Secretary of State was free to sell the property. *Green Hills Dev. Co., LLC v. Sec'y of State*, 275 So. 3d 1077, 1081 (Miss. 2019). But the court also found that Green Hills' ongoing involvement with Stonebridge gave it standing to challenge whether the subsequent sale to the Stonebridge LLCs violated Mississippi law:

> As developer, Green Hills has [a] colorable interest in whether the purchasers hold valid land patents. Green Hills has also suffered an adverse effect from the purchasers' countersuit . . . to divest Green Hills of its interest in the common areas. Thus, Green Hills has standing to challenge the land patents' validity.

*Id.* [3]

---

[3] The Mississippi Supreme Court referenced "common areas." *Id.* Though previous briefings have been unclear, the "common areas" appear to denote a 1.88-acre parcel described in a 2017 Deed of Trust filed by Green Hills. Turnage explains in his rebuttal that the Stonebridge LLCs

Following remand, the chancery court again granted summary judgment against Green Hills. Accordingly, Counterclaim Plaintiffs contend that "title to the [Stonebridge p]roperty is vested in the Stonebridge LLCs . . . and Green Hills has no right, title or interest in such property." Oppenheimer Am. Ans. [62] at 32, Counterclaim ¶ 2.39.

On May 16, 2019—while the 2016 Lawsuit was still pending on appeal—Green Hills and minority-bondholder Dell Group filed this lawsuit against Oppenheimer, UMB Bank, and the Stonebridge LLCs in Hinds County Circuit Court. Defendants removed the case and then sought dismissal. The Court granted that motion in part, and Defendants filed amended answers and counterclaims on March 26, 2020.

Relevant here, the counterclaims added Turnage as a counterclaim defendant under Federal Rules of Civil Procedure 13(h) and 20. Green Hills and Dell Group moved to dismiss the counterclaims, and Counterclaim Plaintiffs sought leave to serve Turnage and two additional parties. The Court denied Green Hills and Dell Group's motions to dismiss and permitted joinder of the additional Counterclaim Defendants.[4]

Turnage now seeks dismissal of the counterclaims against him, including: (1) claims by Oppenheimer and UMB Bank for tortious interference with the Trust Indenture; (2) claims by Oppenheimer and UMB Bank for tortious interference with the Bondholder Funding Agreement between those parties; (3) claims by Oppenheimer and UMB Bank for slander of title with respect to the Trust Estate; (4) a slander-of-title claim brought by the Stonebridge LLCs

---

have referred to this parcel as the "Community Center Property." Turnage Rebuttal [126] at 3–4. For consistency, the Court will continue to refer to this as the "Community Center Parcel" unless quoting from another source. *See* Order [101] at 5 n.4. As discussed below, the parties dispute who owns this property.

[4] The Court has supplemental jurisdiction over the claims against Turnage under 28 U.S.C. § 1367(a). *See State Nat'l Ins. Co. v. Yates*, 391 F.3d 577, 579–80 (5th Cir. 2004).

regarding the properties the LLCs purchased from the Secretary of State; and (5) a civil-conspiracy claim brought by Oppenheimer and UMB Bank.

Throughout these counterclaims, and in their briefs on Turnage's motions, Counterclaim Plaintiffs describe events they view as forming a pattern of interference with their contract rights. The Court will not repeat each alleged act at every step of the analysis in this Order, but the pleadings include assertions that:  (1) Green Hills and Turnage omitted material information from a September 21, 2007 Certificate of Developer, Oppenheimer Am. Ans. [62] at 33, Counterclaim ¶ 2.42; (2) Turnage and others conspired to "artificially create secondary-market conditions" so they could purchase Series 2007 Bonds below true value and "re-acquire the Subject Property," *id.* at 20, Counterclaim Preamble ¶ (vi); (3) Green Hills offered to buy bonds at 10 cents on the dollar, *id.* at 29, Counterclaim ¶ 2.30; (4) Turnage and Green Hills manipulated Stonebridge PID's Board of Directors and inserted Green Hills' attorney as attorney for Stonebridge PID to avoid Green Hills' obligations, secure the release of monies on deposit in the Series 2007 Trust Estate, and otherwise interfere with Counterclaim Plaintiffs' rights and remedies, *id.* at 26, Counterclaim ¶ 2.21; (5) Green Hills, under Turnage's direction, filed a "specious" state-court complaint seeking an order voiding the LLCs' court-approved purchases after Green Hills lost all ownership in those properties, *id.* at 31, Counterclaim ¶ 2.35; *see also id.* at 30, 33, Counterclaim ¶¶ 2.34, 2.40; (6) after losing all interest in the properties, Green Hills and Turnage caused amendments to the Stonebridge protective covenants "designed and intended solely to discourage or prohibit the sale or further development of the property to or by anyone other than Green Hills through the implementation of impractical and unconscionable building restrictions," *id.* at 41, Counterclaim ¶ 2.62; *see also id.* ¶ 2.61; (7) Green Hills "recorded a Lis Pendens covering the entire Subject Property" and allowed it to remain after a

court finding that the Stonebridge LLCs hold valid title, *id.* at 42, Counterclaim ¶ 2.63; (8) Green

Hills and Turnage recorded "a fraudulent warranty deed purporting to transfer a portion of the

Subject Property upon which the Community Center had been constructed from Green Hills to

Green Hills" for ten dollars, "[d]espite having no ownership interest in any of the Subject

Property," *id.* ¶ 2.65; (9) again, with "no ownership interest," Green Hills and Turnage caused to

be recorded a Deed of Trust in 2017 on the Community Center Parcel, *id.* at 43, Counterclaim

¶¶ 2.66, 2.67; (10) Turnage and Green Hills drew and attempted "to draw funds . . . from the . . .

Trust Estate to which they had and have no rights," *id.* at 44, Counterclaim ¶ 3.5; and (11)

"Turnage continue[s] to publicly and fraudulently represent Green Hills as the owner of the

Community Center Parcel and 'Declarant' under the Original Covenants," *id.*

## II.    Standard

Turnage filed his motions under Federal Rule of Civil Procedure 12(b)(6).  When

considering a motion under Rule 12(b)(6), the "court accepts 'all well-pleaded facts as true,

viewing them in the light most favorable to the plaintiff.'"  *Martin K. Eby Constr. Co. v. Dall.*

*Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d

322, 324 (5th Cir. 1999) (per curiam)).  But "the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007)).

To overcome a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim

to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "Factual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555 (citations and footnote

omitted). "This standard 'simply calls for enough fact to raise a reasonable expectation that

discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material

Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

Finally, significant to the present motions, dismissal under Rule 12(b)(6) on the basis of

an affirmative defense—such as a statute of limitations—is appropriate only if "it is evident from

the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for

tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003).

III.    Analysis

    A.    Slander of Title[5]

All Counterclaim Plaintiffs assert that Turnage slandered their title to property. "To

succeed in an action for slander of title, a claimant must show that another has *falsely* and

*maliciously* published statements that disparage or bring into question the claimant's right or title

to the property, thereby causing special damage to the claimant." *Mize v. Westbrook Constr. Co.

of Oxford, LLC*, 146 So. 3d 344, 348 (Miss. 2014).

According to the Stonebridge LLCs, Turnage slandered title to the Subject Property in the

following ways:

> At all times relevant hereto and continuing until the initiation of this action, Green
> Hills and Turnage have falsely, maliciously and repeatedly made and published,
> and continue to make and publish statements that disparate or bring into question
> [the] Stonebridge LLC[s'] title to the Subject Property and, therefore, the
> bondholders' beneficial interest in such property. These statements, made falsely,
> maliciously and repeatedly to cause special damage to the bondholders, include
> recording and allowing to remain of record the fraudulent 2015 Community
> Center Deed; recording and allowing to remain of record the fraudulent 2017

---

[5] Because the Stonebridge LLCs' sole claim is for slander of title, the Court will focus on the
arguments made in the briefs on Turnage's motion to dismiss their claim. Similar arguments are
made in all three sets of briefs.

> Deed of Trust; failure to remove the Lis Pendens; statements that the Forfeited Tax Land Patents issued by the Secretary of State to the Stonebridge LLCs were "void;" the placing of record and allowing to remain of record, by Green Hills and Turnage of the Pebble Creek Amendments and Commercial Covenants for the sole purpose of discouraging or preventing the sale to or further development of the Subject Property by anyone other than Green Hills and Turnage; and continued representations to the Pebble Creek HOA and others that Green Hills is the owner of the Community Center property and "Declarant" under the Original Covenants.

Stonebridge LLCs Am. Ans. [61] at 42–43, Counterclaim ¶ 3.8.  The slander-of-title claims filed by Oppenheimer and UMB Bank relate to the Trust Estate:

> At all times relevant hereto and continuing until the initiation of this action, Green Hills[] and Turnage . . . have falsely, maliciously and repeatedly made and published, and continue to make and publish statements that disparage or bring into question UMB Bank's right, title and interest to the Series 2007 Trust Estate, including the Special Assessments and the Subject Property, and, therefore, the bondholders' beneficial interest in such property.  These statements, made falsely, maliciously and repeatedly to cause special damage to the bondholders, include (i) statements that Green Hills has an interest in or right to monies on deposit in the Developer Reserve Account to which the Trustee has legal title and [Oppenheimer] has beneficial title, (ii) statements the Stonebridge PID—not the Series 2007 Trust Estate and the holders of beneficial interests therein—has rights, title and interest in the Special Assessments as evidenced by Goodwin's certification of assessment rolls to the Rankin County Tax Assessor for Fiscal Years 2017–2019, (iii) instruments fraudulently and publicly recorded against the Subject Property, (iv) failing to remove the 2016 Lis Pendens publicly recorded against the Subject Property, and (v) upon information and belief, continuing statements to the Pebble Creek HOA regarding title to all or a portion of the Subject Property.

Oppenheimer Am. Ans. [62] at 48–49, Counterclaim ¶ 3.21; *see also* UMB Bank Am. Ans. [60] at 49, Counterclaim ¶ 3.30 (making nearly identical allegations).

In his opening memorandum, Turnage advanced arguments for dismissal that generally fell into five categories:  (1) his judicial filings are not actionable; (2) the slander-of-title claims are time barred; (3) Counterclaim Plaintiffs have failed to allege special damages; (4) the

8

counterclaims are pleaded collectively as to Green Hills and Turnage; and (5) Counterclaim

Plaintiffs failed to plead malice or knowledge of a false statement.[6]

### 1.    Immunity/Privilege

Turnage asserts (as did Green Hills in its motion to dismiss) that his and Green Hills'

judicial filings are not actionable.  Thus, no liability for slander of title flows from suing

Counterclaim Plaintiffs and filing the disputed *lis pendens*.  The Court agreed with that argument

when Green Hills asserted it, noting that

> "[c]ommunications published in due course of a judicial proceeding are absolutely
> privileged and will not sustain an action for slander of title."  *Mize*, 146 So. 3d at
> 349.  "For example, the filing of a *lis pendens* notice in the due course of a
> judicial proceeding will not give rise to slander of title."  *Id.*

Order [101] at 17.  While that quote remains accurate, further review casts doubt on its

categorical application.

Although the *Mize* court addressed "absolute immunity," it went on to consider whether

the offending judicial proceeding was filed in "good faith," and whether the plaintiff had a "bona

fide belief" in ownership when he filed the suit.  146 So. 3d at 350–51.  At least one secondary

source has concluded:  "Provided the title action is brought in good faith involving an honest

dispute as to the ownership of property, filing the suit does not by itself constitute grounds to

support an action for slander of title."  7 Miss. Prac. Encyclopedia of Miss. Law § 60:117 (2d

ed.).  There is more authority to consider on this point, but because this issue does not affect the

---

[6] Turnage notes in rebuttal that Counterclaim Plaintiffs failed to respond to many of his
substantive arguments.  *See, e.g.*, Turnage Rebuttal [128] at 2–5 (listing arguments he believes
Counterclaim Plaintiffs ignored).  That's partially true; Counterclaim Plaintiffs left unanswered
some arguments they should have addressed.  But some of the issues Turnage claims they
ignored relate to his affirmative defenses—defenses Counterclaim Plaintiffs *did* address by
noting that this Court previously rejected those arguments when Green Hills asserted them.
While Counterclaim Plaintiffs' failure to fully address the issues is frustrating, it does not
constitute waiver of their claims, so the Court was left to address them.

outcome of today's ruling, the Court will hold it for another day when it can be considered on complete briefing.  Obviously though, this legal issue must be resolved because it dramatically impacts the scope of the claims.

In a related argument, Turnage invokes the *Noerr*-*Pennington* doctrine.  *See* Turnage Mem. [114] at 11.  "The essence of the doctrine is that parties who petition the government for governmental action favorable to them cannot be held civilly liable[,] including 'petitions' made to the judicial branch of government, e.g., in the form of administrative or legal proceedings." *Jourdan River Ests., LLC v. Favre*, 278 So. 3d 1135, 1151 (Miss. 2019) (brackets and ellipses omitted) (quoting *Harrah's Vicksburg Corp. v. Pennebaker*, 812 So. 2d 163, 171 (Miss. 2001)). But that doctrine includes a "sham exception" that applies when, among other things, the suit is "objectively baseless."  *Id.* at 1152 (quoting *Harrah's*, 812 So. 2d at 172).  Given the overall scope of the factual accusations in the counterclaims, as noted above, the applicability of this affirmative defense is not yet evident.

### 2.     Statute of Limitations

"The statute of limitations for . . . slander of title is one year."  *Jourdan River*, 278 So. 3d at 1148 (citing Miss. Code Ann. § 15-1-35).  Where the alleged slander takes the form of a deed recordation, the statute begins to run "when the instrument[] [is] filed for public record."  *Walley v. Hunt*, 54 So. 2d 393, 398 (Miss. 1951).

Counterclaim Plaintiffs note that the Court has already rejected a statute-of-limitations argument by Green Hills.  Specifically, in its previous Order, the Court pointed to the Stonebridge LLCs' allegation that Green Hills and Turnage made "continuing statements to the Pebble Creek HOA and others that Green Hills is the owner of the Community Center [P]roperty."  Stonebridge LLCs Am. Ans. [61] at 43, Counterclaim ¶ 3.8; *see* Order [101] at 17–

10

18. If true, that happened when Green Hills allegedly had no such interest. *See, e.g.*,

Stonebridge LLCs Am. Ans. [61] at 41, Counterclaim ¶ 2.64.

Turnage anticipated this issue in his opening memorandum, arguing that Counterclaim

Plaintiffs failed to plausibly allege that Green Hills lacked ownership of the Community Center

Parcel. As he put it, "[t]he State of Mississippi attempted to grant title to

[Oppenheimer]/Stonebridge Holdings II, LLC of approximately 114.58 acres in the 'W2 Section

35, Township 5N, Range 3E.'" Turnage Mem. [120] at 4. Section 35, Township 5N is part of

the description provided in the 2017 Deed of Trust that Green Hills filed for the Community

Center Parcel. *See* 2017 Deed [60-25] at 8. But Turnage asserts that the allegations are

conclusory, stating that "[m]ere reference to tax parcel numbers or the implied conclusion that

two (2) parcels of land are located within the same 320 acres half-section does not plausibly

allege that one parcel is located within the other parcel." Turnage Mem. [120] at 4.

This will need to be sorted out through competent record evidence, but the pleaded facts

are not conclusory. Moreover, "[t]he plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Iqbal*, 556 U.S. at 678 (citation omitted). The pleaded facts and assertion that Green Hills did

not own the Community Center Parcel satisfy this test. As a result, alleged statements from

Turnage claiming Green Hills' ownership in the Community Center Parcel within the statutory

window are sufficient.

The Court's previous statute-of-limitations ruling also relied on UMB Bank's and

Oppenheimer's allegations that Green Hills and Turnage made "statements [that] the Stonebridge

PID—not the Series 2007 Trust Estate and the holders of beneficial interests therein—has rights,

title and interest in the Special Assessments as evidenced by [the] certification of assessment

11

rolls to the Rankin County Tax Assessor for Fiscal Years 2017–2019." UMB Bank Am. Ans.

[60] at 49, Counterclaim ¶ 3.30; *accord* Oppenheimer Am. Ans. [62] at 49, Counterclaim ¶ 3.21;

*see* Order [101] at 18. Those allegations still appear plausible.

Thus, for essentially the same reasons as previously stated, the Court concludes that the

statute-of-limitations defense is not "evident from the plaintiff's pleadings." *Jones*, 339 F.3d at

366. Counterclaim Plaintiffs allege some wrongdoing by Turnage within the statutory period

sufficient to withstand this defense at the Rule 12(b)(6) stage. *See* Order [101] at 18.[7]

3.      Special Damages

Turnage makes three related arguments regarding special damages: (1) the slander-of-

title claims fail to allege special damages; (2) "[s]peculation about [lost] sales is not special

---

[7] There remains a question whether the continuing-tort doctrine applies to this claim and the tortious-interference claims. Viewed in isolation, the limitations period has lapsed as to some, though not all, of the acts Counterclaim Plaintiffs allege. But the continuing-tort doctrine can toll the statute of limitations until the defendant's "tortious acts cease. . . . A continuing tort is one inflicted over a period of time . . . . [The doctrine] is occasioned by continual unlawful acts, not by continual ill effects from an original violation." *Pierce v. Cook*, 992 So. 2d 612, 619 (Miss. 2008) (quoting *Stevens v. Lake*, 615 So. 2d 1177, 1183 (Miss. 1993)). Relying on *Jourdan River*, Turnage says "[t]he Mississippi Courts have rejected the notion that slander of title is a tort which can be continuing." Turnage Mem. [114] at 12 (citing 278 So. 3d at 1150). But *Jourdan River* made no such pronouncement. There, the Mississippi Supreme Court held that the continued presence of a gate, which had been built more than a year before suit was filed, was not a "continual unlawful act," but a "harm reverberat[ing] from a single, one-time act or omission," and therefore the continuing-tort doctrine did not apply. *Jourdan River*, 278 So. 3d at 1150. The court did not say the doctrine never applies to a slander-of-title claim where conduct has occurred within the window. Turnage also relies on *Walley*, arguing that "[t]he time to sue is not extended even if the 'false statement concerning the complainant's title was [later] communicated to a prospective purchaser.'" Turnage Mem. [114] at 12 (quoting 54 So. 3d at 398). But the subsequent communications within the limitations period in *Walley* were not made by the defendants who recorded false deeds more than one year before suit was filed. 54 So. 3d at 398. This case is different because Counterclaim Plaintiffs allege slanderous statements by Counterclaim Defendants occurring before and after the limitations period. In its last Order, the Court noted that the continuing-tort theory required further development because "neither side sufficiently analyzed this issue when applied to these claims." Order [101] at 14. That remains true, and, because it does not affect the outcome, the Court will again defer and wait for further briefing.

12

damage"; and (3) the Stonebridge LLCs have alleged that the bondholders—not the Stonebridge LLCs—have suffered special damage.  Turnage Mem. [114] at 5 (citing *Mize*, 146 So. 3d at 348).

As an initial point, Turnage argues that Counterclaim Plaintiffs violated Federal Rule of Civil Procedure 9(g), which states that if "an item of special damage is claimed, it must be specifically stated."  Turnage Mem. [114] at 3 (quoting Fed. R. Civ. P. 9(g)).  He then dovetails that argument with one under Rule 8, which requires sufficient factual assertions to state a plausible claim.  *Id.*  But Rule 9(g) "is designed to inform defending parties as to the nature of the damages claimed in order to avoid surprise; and to inform the court of the substance of the complaint."  *Great Am. Indem. Co. v. Brown*, 307 F.2d 306, 308 (5th Cir. 1962).  The rule does not require a pleaded amount.  *United States ex rel. Monsour v. Performance Accts. Receivable, LLC*, No. 1:16-CV-38-HSO-JCG, 2018 WL 4682343, at *19 (S.D. Miss. Sept. 28, 2018) (citing *Brown*, 307 F.2d at 308).

Here, Counterclaim Plaintiffs provided sufficient notice of the nature of the claimed special damages, including the "inability to 'market and sell the Subject Property'" and related costs, taxes, and interest.  Stonebridge LLCs Mem. [122] at 6 (quoting Stonebridge LLCs Am. Ans. [61] at 43, Counterclaim ¶ 3.11); *see also* Oppenheimer Am. Ans. [62] at 49, Counterclaim ¶ 3.21; UMB Bank Am. Ans. [60] at 50, Counterclaim ¶ 3.31.

Turnage responds that speculation about lost sales fails to establish special damages.  Turnage Mem. [114] at 5 (citing *Mize*, 146 So. 3d at 348).  While "damages arising from the lost sale of disputed property will not be imposed on a party who, in good faith, seeks a determination of ownership of the disputed property," *Mize*, 146 So. 3d at 348, the

counterclaims—taken as a whole and in the light most favorable to Counterclaim Plaintiffs—plausibly assert bad faith.  In any event, the special damages are sufficiently pleaded.

Turnage also makes several arguments that raise factual disputes the Court may not address under Rule 12(b)(6).  First, he questions whether the Stonebridge LLCs themselves incurred any injuries or whether all injuries were necessarily directed to the bondholders.  Turnage Mem. [114] at 4.  But viewing the factual allegations in the light most favorable to Counterclaim Plaintiffs, the LLCs—even if ultimately owned by others—held title to the property and have sufficiently asserted special damages related to that ownership.  This too is an issue that may require additional briefing.

Another fact question is whether Turnage's alleged statements could have slandered the title given the ongoing litigation over the Subject Property.  Specifically, Turnage says that "the title "was potentially void" and that "[n]o Mississippi Courts have validated or confirmed their alleged title." *Id.* at 8.  That assertion is factually untrue.  Seven months before Turnage filed his briefs, a Mississippi chancery court judge held "that all of the land patents for the Subject Property, and the prerequisites necessary to their issuance are in all respects valid and proper." Chancery Court Order [122-1] at 3.  Indeed, the holding is pleaded in the counterclaims.  *See, e.g.*, Oppenheimer Am. Ans. [62], Counterclaim ¶ 2.39.

Counterclaim Plaintiffs cite that holding in their responses.  Turnage, in reply, contends that the Court must ignore the chancery-court order because it is beyond the Rule 12(b)(6) scope of review.  Turnage Rebuttal [126] at 11 n.5.  That, too, is incorrect.  For starters, the counterclaims reference the holding.  Plus, district courts may take judicial notice of state-court orders under Rule 12(b)(6).  *Davis v. Bayless*, 70 F.3d 367, 372 (5th Cir. 1995).  But even if the

chancery-court order is beyond the scope of review, so too would be Turnage's argument.  In any event, Turnage cannot in good faith argue that no such holding ever occurred.

More substantively, the Court accepts the well-pleaded facts as true, including the assertions that Green Hills had no ownership interest in the Subject Property and that Turnage's pleaded conduct impeded the efforts to sell that property, resulting in special damages. Stonebridge LLCs Am. Ans. [61] at 41–44, Counterclaim ¶¶ 2.61–3.11.  Raising a question of fact on causation does not entitle Turnage to dismissal because Counterclaim Plaintiffs have pleaded "enough fact to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements."  *In re S. Scrap Material Co., LLC*, 541 F.3d at 587 (quoting *Twombly*, 550 U.S. at 556).

### 4.    Collective Pleading

Next, Turnage says that the allegations lump him and Green Hills together, such that no allegedly slanderous statement is attributed to Turnage specifically.  For example, the Stonebridge LLCs pleaded that "Green Hills and Turnage . . . [made] representations to the Pebble Creek HOA."  Stonebridge LLCs Am. Ans. [61] at 43, Counterclaim ¶ 3.8.

In cases alleging fraud, to which Federal Rule of Civil Procedure 9(b) applies, "[i]t is impermissible to make general allegations that lump all defendants together; rather, the complaint must segregate the alleged wrongdoing of one from another."  *In re Parkcentral Glob. Litig.*, 884 F. Supp. 2d 464, 471 (N.D. Tex. 2012).  But as Counterclaim Plaintiffs point out, fraud is not a necessary element of a slander-of-title claim.  Stonebridge LLCs Mem. [122] at 9.

There are other times when collective pleading of this nature would not satisfy Rule 8. But here, the counterclaims adequately plead that Turnage was an agent for Green Hills and acted on its behalf.  *See, e.g.*, Stonebridge LLCs Am. Ans. [61] at 17, Counterclaim Preamble

¶ (i) (stating that "Green Hills and Turnage petitioned for the establishment of" Stonebridge PID and attaching the petition Turnage signed).  As an entity, Green Hills must act through its agents. So, viewing the pleaded facts in the light most favorable to Counterclaim Plaintiffs, when Green Hills and Turnage are said to have acted together, it is plausible that Green Hills was acting through Turnage.  Like other issues in these motions, Counterclaim Plaintiffs will need to support their assertions with facts; but for now, dismissal is not warranted.

5.      Insufficiently Pleaded Elements

Turnage next says the malice and knowledge elements of the slander-of-title claim are insufficiently pleaded.  Rule 9(b) makes clear that "[m]alice . . . may be alleged generally."  In addition, malice "may be inferred from one's actions.  'The law determines malice by external standards; a process of drawing inferences by applying common knowledge and human experience to a person's statements, acts, and the surrounding circumstances.'"  *Mize*, 146 So. 3d at 348 (quoting *Phelps v. Clinkscales*, 247 So. 2d 819, 821 (Miss. 1971)).  Here, while the malice allegations themselves may be somewhat conclusory, the overall factual allegations cataloged above—when accepted as true and viewed in the light most favorable to the nonmovants—paint a plausible picture of deliberate attempts to interfere with property rights after Green Hills lost them.

As for the falsity element, Turnage says Counterclaim Plaintiffs failed to allege any facts that would support the conclusion that he knowingly engaged in a false publication.  Rule 9(b) also applies to "knowledge[] and other conditions of a person's mind [that] may be alleged generally."  Here, the counterclaims allege that Turnage "falsely" published statements about Counterclaim Plaintiffs' ownership of the Subject Property and interest in the Trust Estate. Stonebridge LLCs Am. Ans. [61] at 42, Counterclaim ¶ 3.8; UMB Bank Am. Ans. [60] at 49,

16

Counterclaim ¶ 3.30; Oppenheimer Am. Ans. [62] at 49, Counterclaim ¶ 3.21.  Coupled with the other allegations regarding the history of this property and Turnage's acts, these allegations are sufficient.

In sum, Turnage's motions to dismiss are denied as to the slander-of-title claims.  As noted, several major legal issues remain unresolved and will need to be addressed in future motions; some of Turnage's arguments may have more teeth as the facts are developed.  For now, Counterclaim Plaintiffs have said enough.[8]

### B.   Tortious Interference

In the first two counts of their separately filed counterclaims, Oppenheimer and UMB Bank both assert that Turnage tortiously interfered with the Trust Indenture [117-2] and the Bondholder Funding Agreement (BFA) [117-4].  These documents are related, and their scope is significant to these claims.

The Trust Indenture established Stonebridge PID's obligations as "Issuer" of the Series 2007 Bonds, including the duty to assess and collect the Special Assessments Green Hills allegedly failed to pay.  *See* Trust Indenture [117-2] § 1.01 (definition of "Pledged Revenues").

---

[8] Turnage makes three new arguments in rebuttal.  First, he argues that only one of the three Stonebridge LLCs "claim[s] a right to title of the 1.88 [acre] parcel described in the 2015 Deed." Turnage Rebuttal [126] at 6.  As such, Turnage says the counterclaim "fail[s] to state a claim of slander to the 1.88 [acre] parcel for at least two of the Stonebridge LLCs."  *Id.*  Second, he says that "Green Hills is the controlling member of the Pebble Creek HOA and alleged statements by Turnage to the HOA would be in effect statements by Turnage to Green Hills with no publication."  Turnage Rebuttal [127] at 3.  Third, Turnage claims that "the Stonebridge LLCs are straw entities incapable of suffering damage."  Turnage Rebuttal [126] at 10.  Some of these arguments may be worth considering at some point, but this Court generally does not consider "arguments raised for the first time in [a] reply brief."  *RedHawk Holdings Corp. v. Schreiber Trustee of Schreiber Living Tr.*, 836 F. App'x 232, 235 (5th Cir. 2020) (quoting *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1437 (5th Cir. 1989)).  If they are raised again, Turnage will need to offer legal support for the ones he asserted without authority, and Counterclaim Plaintiffs will need to respond.

The indenture also set out duties of the Trustee (now UMB Bank) and addressed available remedies in the event of default.  *Id.* Art. X.  Notably, section 10.06 allows the majority bondholder (Oppenheimer) to "direct the method and place of conducting all remedial proceedings by the Trustee."  *Id.* at 44 (CM/ECF pagination).

After the alleged default of the Trust Indenture, Oppenheimer (as majority bondholder) and UMB Bank say they established the BFA to invoke the default remedies granted in Article X of the Trust Indenture.  The BFA states that a default had occurred and that the LLCs would be formed to purchase the forfeited properties and eventually market them for the benefit of the bondholders.  BFA [117-4] at 2.  Oppenheimer also agreed to "fund Default Expenditures" under the Trust Indenture and be repaid from, among other sources, "net proceeds generated by the [LLCs'] disposal of the Tax Forfeited Property."  *Id.* at 3.  In very basic terms, Counterclaim Plaintiffs say that Turnage and others tortiously interfered with these plans, thereby frustrating the valid effort to market and sell the properties.

To state a claim for tortious interference with a contract under Mississippi law, a party must allege:

> (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted.

*O.W.O. Invs., Inc. v. Stone Inv. Co., Inc.*, 32 So. 3d 439, 448–49 (Miss. 2010) (quoting *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998)).

Turnage contends that the counterclaims must fail for a host of reasons that can be roughly categorized as follows:  (1) the tortious-interference claims are time-barred and

otherwise precluded; (2) Counterclaim Plaintiffs failed to plausibly plead that Turnage's conduct

caused injury; and (3) the BFA claims are factually implausible.[9]

### 1.    Statute of Limitations

Turnage first argues that the tortious-interference claims are time-barred, though he

acknowledges that they allege at least one act within the statutory window—the recording of the

2017 Deed of Trust.  The Court previously relied on that allegation to deny Green Hills' statute-

of-limitations-based motion to dismiss.  Order [101] at 10.  Turnage tries to avoid this

conclusion, arguing that "[t]he Deed of Trust was not signed by Turnage nor shown by facts to

have been recorded by him."  Turnage Mem. [120] at 4.

That's true, but it requires a closer look at an unclear issue—Turnage's role at Green

Hills.  The counterclaims never directly state Turnage's position with Green Hills, but the

documents attached to the counterclaims provide context.  First, Turnage signed the petition to

create Stonebridge PID as Green Hills' "Manager."  PID Pet. [61-1] at 13.  Then, in September

2007, he became guarantor in favor of Stonebridge PID related to Green Hills' obligations to

Stoneridge PID under an acquisition agreement.  Guaranty Agreement [60-8] at 1.  And the

Minnesota state-court petition identified him as "Chief Executive Officer and Manager" of Green

Hills.  Minn. Pet. [60-10] at 3.  These documents plausibly indicate that Turnage had a

significant level of authority within Green Hills, and Counterclaim Plaintiffs have alleged

throughout that he directed Green Hills' actions, including "fraudulently recording . . . the 2017

Deed of Trust."  UMB Bank Am. Ans. [60] at 43, Counterclaim ¶ 3.5; *see also* Oppenheimer

---

[9] Turnage strikes other familiar chords in the tortious-interference section of his memoranda.
For instance, he asserts that the tortious-interference claims fail because the LLCs lacked valid
title and that Green Hills had valid title to the Community Center Property.  *See* Turnage Mem.
[120] at 6.  For the reasons addressed in the slander-of-title section, the Court is not yet
persuaded that these arguments have merit.

Am. Ans. [62] at 44–45, Counterclaim ¶ 3.5 (same); Oppenheimer Am. Ans. [62] at 18 (alleging that Green Hills failed to pay Special Assessments "at Turnage's direction").  On the whole, Counterclaim Plaintiffs have plausibly pleaded that Turnage was involved in the decision to file the 2017 Deed of Trust.

In addition to his involvement in the 2017 Deed of Trust, Counterclaim Plaintiffs also allege that "Turnage's [tortious] conduct continues to this day, including continuing 'to publicly and fraudulently represent Green Hills as the owner of the Community Center Parcel and "Declarant" under the Original Covenants.'"  Oppenheimer Mem. [124] at 8 (quoting Oppenheimer Am. Ans. [62] at 45, Counterclaim ¶ 3.5).  And they claim that tortious interference is a continuing tort, so Turnage's earlier acts are likewise actionable.  *See, e.g.*, *id.* As noted above, this issue has been insufficiently briefed.  Regardless, based just on what is alleged within the limitations window, the statute-of-limitations defense is not evident.

### 2.    Causation

Turnage next asserts that Counterclaim Plaintiffs failed to plead a plausible tortious-interference claim because there is no causation.  In general, he argues that the counterclaims fail to plausibly plead that the Trust Indenture and BFA would have been performed "but for" alleged interference.  Turnage Mem. [120] at 6 (quoting *Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 745–46 (Miss. 2019)).

This argument takes several forms, but one requires more attention than the others. Article X of the Trust Indenture identifies "Events of Default" and explains the available remedies should such default occur.  Trust Indenture [117-2] §§ 10.01–10.13.  As described in the counterclaims, "during the pendency of Events of Default," Counterclaim Plaintiffs have the right to "receive from monies deposited into the Series 2007 Trust Estate 'installments then due

on the [Series 2007 Bonds]' and 'unpaid principal,' including those monies derived from the lease or sale of the Subject Property."  Oppenheimer Am. Ans. [62] at 44, Counterclaim ¶ 3.2 (quoting Trust Indenture [117-2] §§ 10.11(b), 9.32); *see also* UMB Bank Am. Ans. [60] at 42–43, Counterclaim ¶ 3.2 (same).  The BFA reflects Counterclaim Plaintiffs' efforts to realize those default remedies by establishing the LLCs to purchase the lots from the State after they were struck off.  *See* BFA [117-4] at 2.

Counterclaim Plaintiffs also pleaded that Turnage interfered with their right "to receive monies on deposit in the Developer's Reserve Account."  Oppenheimer Mem. [124] at 5 (citing Oppenheimer Am. Ans. [62] at 44, Counterclaim ¶ 3.4).  The Trust Indenture recitals state that Stonebridge PID "hereby assigns, transfers, sets over and pledges to the Trustee and grants a lien on all of the right, title and interest of the Issuer in and to the Pledged Revenues (hereinafter defined) as security for the payment of the principal Redemption Price and interest on Bonds issued."  Trust Indenture [117-2] at 7 (CM/ECF pagination); *see also id.* § 6.01 ("There are hereby pledged for the payment of the principal or Redemption Price of and interest on the Bonds issued, the Pledged Revenues[.]").  "Pledged Revenues" are defined to include, among other things, "all moneys on deposit in the Funds and Accounts established under the Indenture." *Id.* § 1.01.  And, according to Counterclaim Plaintiffs, "[t]he Developer Reserve Account is one of the 'Accounts' established by the Indenture and, therefore, UMB Bank certainly has a right to monies in that account."  Oppenheimer Mem. [124] at 13 (citing Trust Indenture [117-2] § 5.01(d) (establishing the Developer's Reserve Account)); *see also id.* § 1.01 (defining "Account" to include "any account established pursuant to this Indenture").

Turnage offers no meaningful resistance to these constructions, arguing instead that Counterclaim Plaintiffs never enjoyed these rights because *Stonebridge PID* was not in default.

*See* Turnage Mem. [120] at 8 (arguing that, because "Stonebridge PID has not defaulted," the "Trust Indenture does not contain a contract right for [Oppenheimer] or UMB to acquire, sell or lease property"); *see also* Turnage Rebuttal [128] at 7 (stating that "claims concerning the Developer's Reserve Account and the Bondholders Funding Agreement turn on the unfounded and implausible conclusion of a default and post-default rights").

Specifically, Turnage says the Pledged Revenues Stonebridge PID was required to pay into the Funds and Accounts—from which bondholders are paid—included only those Special Assessments Stonebridge PID actually "collected."  Turnage Rebuttal [128] at 6 (citing Trust Indenture [117-2] § 1.01 ("'Pledged Revenues' shall mean . . . all revenues received by the Issuer from Special Assessments levied *and collected*." (emphasis added))).  And because Turnage says Stonebridge PID paid what it collected, it was not in default.

So, the argument goes, if Stonebridge PID was not in default, then no breach occurred, and Oppenheimer cannot show that the agreement would have been performed "but for" Turnage's alleged interference.  *Id.*  Furthermore, because Oppenheimer never enjoyed the Article X default remedies (with which Turnage allegedly interfered), Counterclaim Plaintiffs cannot show that the BFA—which exists to implement those remedies—would have been performed.  *Id.* at 7.  As Turnage puts it, "The BFA is predicated on the implausible myth of a default by Stonebridge PID.  In the absence of a default there are no plausible 'default expenses' under the BFA" for Oppenheimer to fund and recover.  *Id.* at 12.

The question, therefore, is whether Counterclaim Plaintiffs failed to plead factual content that allows a reasonable inference that a default occurred.  Even if, as Turnage maintains, Stonebridge PID had paid what it collected, the possibility of default is not categorically foreclosed; there may be other ways by which the Trust Indenture could have been defaulted.

Section 10.02, for instance, defines what constitutes an "Event of Default" and includes: "if payment of any installment of interest on any Bond is not made when it becomes due and payable." Trust Indenture [117-2] § 10.02(a). Unlike other listed "Events of Default," section 10.02(a) does not specifically reference default by Stonebridge PID. *Compare id.*, *with* § 10.02(c) (stating that "Event of Default" occurs "if the Issuer, for any reason, is rendered incapable of fulfilling its obligations"). This suggests that default occurs even if Stonebridge PID fulfills its obligations under the Trust Indenture if the debt is not fully serviced.

Turnage may have an answer to section 10.02(a), and, then again, there may be other ways a default could occur without Stonebridge PID defaulting. But none of this has been fully briefed, perhaps because Turnage first explained his theory in rebuttal. *See* Turnage Rebuttal [128] at 6 (explaining that no default occurred because Stonebridge PID was only required to pay what it "collected"). In any event, the Court is left with just one side of the construction. Accordingly, the Court makes no findings as to what would constitute an Event of Default and merely notes, for now, that Turnage's construction does not account for Article X's full text.

Regardless, dismissal is not appropriate because the counterclaims allege facts plausibly suggesting that a default occurred. Most notably, Oppenheimer pleaded that after Green Hills lost the properties to the state, UMB Bank filed a Petition for Trust Instruction (PTI) in Minnesota seeking court approval of Article X remedies. *See* Oppenheimer Am. Ans. [62] at 27, Counterclaim ¶ 2.25. That PTI expressly stated that Stonebridge PID was in default, thus triggering Article X. *See* PTI [61-10] ¶ 16. It also sought an order allowing UMB Bank to establish the LLCs to pursue bondholder remedies under Article X. *Id.* ¶ 27. According to the counterclaims, the Minnesota state court granted that PTI, holding: "Events of Default exist under the [Trust Indenture] due to the District's failure to pay interest, principal and redemption

amounts on the [Series 2007 Bonds] when due, its covenant defaults and the other events described in the Petition, including the forfeiture of the Developer Property."  Oppenheimer Am. Ans. [62] at 28, Counterclaim ¶ 2.29 (quoting Minn. Order ¶ 1).  The court then approved the establishment of the LLCs to "own, maintain, market and sell the property."  *Id.* at 29, Counterclaim ¶ 2.29 (quoting Minn. Order ¶ 2).  These well-pleaded facts are enough to plausibly suggest that a default occurred and that Article X was properly invoked.

Assuming the Article X remedies were triggered, the next question is whether Turnage's alleged conduct interfered with either the Trust Indenture or the BFA.  Among other things, Counterclaim Plaintiffs say Turnage's actions depressed the market and "have interfered and continue to interfere with UMB Bank's ability to repay the loan," thus resulting in harm to UMB Bank, Oppenheimer, and the Trust Estate.  Oppenheimer Am. Ans. [62] at 47, Counterclaim ¶ 3.13; *see also* UMB Bank Am. Ans. [60] at 46, Counterclaim ¶ 3.13.

Turnage counters that "[t]he more plausible depressant would be UMB's failure and refusal to pay its taxes, the potentially void title and artificial and unnecessary debt to acquired [sic] to fund UMB's lawlessness."  Turnage Mem. [120] at 10.  But at the Rule 12(b)(6) stage, the question is not which party presents the "more plausible" theory.  *Id.* at 10.  The question is whether the well-pleaded facts state a plausible claim; Counterclaim Plaintiffs' allegations that Turnage's actions rendered the property unmarketable and made UMB Bank unable to repay the loan suffice to meet this requirement.

### 3.    BFA-Specific Arguments

Regarding the BFA, Turnage first says Counterclaim Plaintiffs "did not allege sufficient facts to make the existence of a signed BFA plausible."  Turnage Mem. [120] at 11.  Turnage appears correct in positing that the sole copy of the BFA presently in the record is an unsigned

version he submitted with one of his Motions to Dismiss.  BFA [117-4].  But Counterclaim Plaintiffs plainly allege the existence of the BFA, under which the parties have rights and obligations.  *See, e.g.*, Oppenheimer Am. Ans. [62] at 47, Counterclaim ¶ 3.12 (alleging that Oppenheimer "is a party to the Bondholder Funding Agreement").  Turnage cites no rules or legal authority suggesting that Counterclaim Plaintiffs were required to attach a copy of the agreement to their counterclaims.  The fact that Counterclaim Plaintiffs did not attach a signed copy of the agreement to their counterclaims does not render its existence implausible; this issue is better addressed under Rule 56.

Turnage also claims that the BFA is illegal insofar as it "contemplates and orchestrates the provision of funds for UMB[ Bank]'s activities directed at obtaining tax patent properties." Turnage Mem. [120] at 12 (citing Miss. Code Ann. § 29-1-75).  The Mississippi Supreme Court remanded the dispute between the parties so that the chancery court could evaluate Green Hills' argument under section 29-1-75, and, according to the counterclaims, the chancery court rejected those arguments following remand.  *Green Hills*, 275 So. 3d at 1088–89; *see* Oppenheimer Am. Ans. [62] at 32, Counterclaim ¶ 2.39.  Turnage has not shown that dismissal is required under Rule 12(b)(6) based on the alleged illegality of the BFA.  Turnage's motions to dismiss are therefore denied as to the tortious-interference claims.

C.    Civil Conspiracy

"Under Mississippi law, the elements of a civil conspiracy are:  '(1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result.'"  *Rex Distrib. Co., Inc. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 455 (Miss. 2019) (quoting *Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013)).

Turnage makes three basic arguments regarding the conspiracy claim.  First, he says that it is time barred under Mississippi's three-year statute of limitations.  He points to *Jourdan River*, where the Mississippi Supreme Court held that a conspiracy claim was time-barred despite the plaintiff's insistence that defendants "systemically conspired during a time from September 2007 to the present . . . to destroy plaintiffs' business."  Turnage Mem. [120] at 3 (quoting *Jourdan River*, 278 So. 3d at 1149).  But, as previously noted, that case is distinguishable.  The plaintiff in *Jourdan River* claimed that the defendant built a gate before the limitations window and then failed to remove it.  278 So. 3d at 1150.  Here, Counterclaim Plaintiffs offer well-pleaded factual allegations of Turnage's conduct *within* the limitations window.  The statute-of-limitations defense is not evident from the pleadings.  *See Jones*, 339 F.3d at 366.

Turnage next claims that he and Green Hills could not have conspired with each other because "[a]n employee cannot ordinarily conspire with his corporate employer."  *Aiken v. Rimkus Consulting Grp. Inc.*, 333 F. App'x 806, 812 (5th Cir. 2009).  As noted, Turnage's precise role with Green Hills is not clear, but assuming his argument is correct as to Green Hills, Counterclaim Plaintiffs further allege that he conspired with Dell Group, Counter-Defendant Jeff Goodwin, and Stonebridge PID.

Finally, Turnage argues that Counterclaim Plaintiffs' "inability . . . to state a claim for the principal claims of slander and [tortious] interference results in a failure to state a claim for conspiracy."  Turnage Mem. [120] at 16.  The Court has, however, found the underlying torts plausible, so the civil-conspiracy claims likewise survive.

IV.     Conclusion

The Court has considered all arguments.  Those not addressed would not have changed the outcome.  For the foregoing reasons, Turnage's Motions to Dismiss [113, 117, 119] are denied.

**SO ORDERED AND ADJUDGED** this the 28th day of September, 2021.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE