UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| GREEN HILLS DEVELOPMENT COMPANY, LLC, AND DELL GROUP HOLDINGS, LLC | PLAINTIFFS |
| V. | CIVIL ACTION NO. 3:19-CV-416-DPJ-FKB |
| OPPENHEIMER FUNDS, INC., D/B/A OPPENHEIMER ROCHESTER HIGH YIELD MUNICIPAL FUND, ET AL. | DEFENDANTS/ COUNTER-PLAINTIFFS |
| V. | |
| GREEN HILLS DEVELOPMENT COMPANY, LLC, DELL GROUP HOLDINGS, LLC, STONEBRIDGE PUBLIC IMPROVEMENT DISTRICT, BEN O. TURNAGE, JR., AND JEFF GOODWIN | COUNTER-DEFENDANTS |

ORDER

Counter-Plaintiff UMB Bank, N.A., says Counter-Defendant Stonebridge Public Improvement District ("Stonebridge") breached its contractual obligations under a Trust Indenture that was established for a bond-financed residential development in Rankin County, Mississippi. UMB Bank now seeks partial summary judgment in its favor on the breach-of-contract claims and asks the Court to appoint a receiver. *See* UMB Bank Mots. [164, 166]. But Stonebridge says the motions should be denied and that summary judgment should instead be granted in its favor on all counterclaims UMB Bank asserts against it. *See* Stonebridge Mot. [182]. Finally, UMB Bank invokes Federal Rule of Civil Procedure 56(d) and asks the Court to defer ruling on Stonebridge's motion for summary judgment on UMB Bank's civil-conspiracy claim. *See* UMB Bank Mot. [203]. As explained below, both motions for summary judgment

[164, 182] and the motion to appoint a receiver [166] are denied; UMB Bank's Rule 56(d) motion [203] is granted.

I.      Facts and Procedural History

While the Court and the parties are familiar with the factual background, the Court restates the relevant facts here for clarity.  In 2007—upon petition filed by Plaintiff Green Hills Development Company, LLC—the Rankin County Board of Supervisors created the Stonebridge Public Improvement District to manage and finance public-improvement services for property located within the then newly established Stonebridge development.  Green Hills was the developer and initially owned most of the property.

In September 2007, Stonebridge's board issued bonds through a Trust Indenture; Bank of the Ozarks was named Trustee; and Defendant UMB Bank later became Successor Trustee. Under the terms of the Trust Indenture, Stonebridge was to levy special assessments on properties within the development and remit the revenues collected to the Trustee to service the debt on the bonds.

Trouble started when Green Hills failed to pay the assessments levied on properties it owned.  Because Green Hills failed to pay, Stonebridge did not remit amounts necessary to service the debt to the Trustee.  And Green Hills's residential and commercial lots in the development "were struck off to the state of Mississippi" in 2009 and 2010.  State Ct. R. [1-2] at 12, Compl. ¶ 3.12.

Then the lawsuits began.  Relevant here, Bank of the Ozarks first sued Stonebridge, Green Hills, and others in Rankin County Chancery Court on April 27, 2010.  Compl. [50-1].  In its complaint, Bank of the Ozarks sought judicial foreclosure and the appointment of a receiver based on Stonebridge's failure to "have the required number of board members to act in

accordance with Mississippi law." *Id.* ¶ 16.  After it became the Successor Trustee, UMB Bank was substituted as the plaintiff in that case, and, following transfer to Rankin County Circuit Court, UMB Bank filed an amended complaint on December 11, 2016.  Am. Compl. [50-2].  The amended complaint dropped the request for appointment of a receiver and contained a breach-of-contract claim against Stonebridge.  That claim alleged as follows:

> 204. [Stonebridge] has breached its contractual obligations under the Trust Indenture by, among other things, failing to tender certain monetary payments to the Bond Trustee (including but not limited to payments of interest on the Bonds) that are due and owing under the terms of the Trust Indenture, as well as in having failed to satisfy financial disclosure and other reporting obligations mandated of the Stonebridge by the Trust Indenture.
>
> 205. Specific provisions of the Trust Indenture that [Stonebridge] has breached include Sections 4.01; 6.01; 9.03; 9.06; 9.09; 9.12; 9.15; 9.16; 9.17; 9.18; 9.20; 9.21; 9.23; 9.30; 9.31; 9.32; 10.02; 10.04; and 11.04.
>
> 206. [Stonebridge] has breached its contractual obligations under the Continuing Disclosure Agreement by, among other things, failing to satisfy financial disclosure and other reporting obligations mandated of [Stonebridge] by the Continuing Disclosure Agreement.
>
> 207. Specific provisions of the Continuing Disclosure Agreement that [Stonebridge] has breached include Sections 3; 4; 5; and 10.

*Id.* ¶¶ 204–07.

The Rankin County Circuit Court ultimately dismissed the claims set forth in UMB Bank's amended complaint as time barred.  The state court apparently found that the claims accrued more than three years before UMB Bank filed the December 2016 amended complaint.  It therefore considered "whether the new causes of action in the Amended Complaint relate back to the original claims within the meaning of" Mississippi Rule of Civil Procedure 15(c) "and are not, therefore, time barred."  Order [50-8] at 2.  The court noted that while "both the original Complaint and the Amended Complaint can all be said, in a very general way, to arise from the general relationship between [Stonebridge] and the plaintiff, the amended complaint attempts to

prosecute new causes of action against [Stonebridge]." *Id.* at 3.  As a result, the court concluded that the claims in the Amended Complaint "do not relate back," "are time-barred[,] and should be dismissed." *Id.*[1]

Meanwhile, in 2015, UMB Bank created the Stonebridge LLCs to "purchase[], maintain[], market[] and sell[] the [Stonebridge property] for the benefit of the . . . [b]ondholders."  UMB Am. Answer [60] at 26, Countercl. ¶ 2.24.  UMB Bank sought approval for the purchase in Minnesota state court.  *See* Petition [172-7].  On August 6, 2015, the Minnesota court found that "Events of Default exist[ed] under the Indenture due to [Stonebridge's] failure to pay interest, principal and redemption amounts on the Bonds when due" and allowed the Stonebridge LLCs to purchase the properties that had been struck off.  Order [172-8] at 1–2.  The Stonebridge LLCs then applied to purchase the properties from the Mississippi Secretary of State, and they were awarded ownership in June and July 2016.

On May 16, 2019, Green Hills and minority bondholder Dell Group filed this lawsuit against majority bondholder Oppenheimer Funds, Inc., UMB Bank, and the Stonebridge LLCs in Hinds County Circuit Court.  Defendants removed the case and ultimately filed Amended Answers and Counterclaims on March 26, 2020.  Relevant here, the Counterclaims added Stonebridge as a Counter-Defendant.  UMB Bank now asks the Court to award it summary judgment on its claims against Stonebridge for breach of contract and for the appointment of a receiver.  Stonebridge seeks summary judgment in its favor on all the counterclaims asserted against it.  And Counter-Plaintiffs contend additional discovery is needed before they can fully respond to Stonebridge's motion for summary judgment as to the civil-conspiracy claim.

---

[1] That case remains pending on counterclaims filed by Stonebridge and Jeff Goodwin against UMB Bank.

II.   Analysis

    A.   Summary-Judgment Motions

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

But "even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'a better course would be to proceed to a full

trial.'" *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986)).

Here, the Court spent considerable time studying the legal briefs, independently researching the arguments, and examining the record, but the factual and legal pictures remain unclear. The Court acknowledges that some of its questions may flow from its own misunderstanding of this highly complicated and voluminous record. On the other hand, the parties often offer argument snippets unsupported by relevant legal authority or supporting record evidence.[2] They also ignore, or lightly touch, what appear to be significant arguments offered by opposing parties.

In candor, the deficiencies are often more glaring from Counter-Defendants, but the Court is still left with too many open questions to grant judgment for either side. Accordingly, the Court will deny the cross motions for summary judgment for reasons that include, but are not limited to, the following:

1. The parties dispute whether the Court is bound by the August 8, 2015 Minnesota state-court order finding that the indenture was in default "due to the District's failure to pay interest, principal and redemption amounts on the Bonds when due, its covenant defaults and other events described in the Petition." Order [172-8] at 1; *see also* Pet. [172-7] at 1 (identifying Stonebridge as "the District").

    o Stonebridge argues that the Minnesota order "is a nullity" because "[o]nly Minnesota law is referenced in the Petition and Order. Mississippi law was never referenced or considered." Stonebridge Mem. [175] at 12. That argument is not persuasive. True enough, both the petition and order referenced Minnesota procedural statutes, primarily Minnesota Statute section 501B.16, which, before it was repealed in 2015, allowed a trustee to petition for an order "to construe,

---

[2] It is certainly possible that somewhere in this massive record are documents supporting some of their assertions. But under Rule 56(c), the non-movant must "articulate the precise manner in which the submitted or identified evidence supports his or her claim." *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004). The Court is under no "duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379–80 (5th Cir. 2010) (citation omitted,

interpret, or reform the terms of a trust, or authorize a deviation from the terms of a trust." Order [172-8] at 1; *see* Pet. [172-7] at 1. But there is no indication from the disputed order that the Minnesota court applied the substantive law of that state to construe the Trust Indenture. In fact, under section 501B.16, the reviewing court applies the applicable state law. *See In re Trusteeship Created by City of Sheridan*, 593 N.W.2d 702, 708 (Minn. Ct. App. 1999) (considering appeal of section 501B.16 proceeding and noting, "We interpret the trust under Colorado law because of the trust instrument's choice-of-law provision"). And the Petition did reference Mississippi law. *See, e.g.*, Petition [172-7] ¶¶ 11–13, 18, 31 & n.3.

- o   The bigger question is whether preclusion applies given the notice Stonebridge received. According to Stonebridge, it was never served with process; at most, it may have received a copy of the notice to the bond holders. *See* Notice [182-11] at 1. That notice stated that "[e]very holder of Bonds will have the right to appear at the hearing." *Id.* at 4. It did not state that Stonebridge had such rights. *Id.* UMB Bank responds by arguing that Stonebridge received the notice it was due under Minnesota law. UMB Bank Mem. [202] at 10. Perhaps, but neither party offers legal analysis explaining the preclusive effect, if any, that attaches against a non-party receiving such notice.

- o   Also, section 501B.21 of the Minnesota Statutes, which was repealed in 2015, says that an order under section 501B.16 is "binding in rem upon the trust estate and upon the interests of all beneficiaries" but does not indicate whether it would be binding upon an obligor under a trust indenture with respect to a breach-of-contract claim. This too has not been addressed.

- o   The Court has not conducted independent research to determine whether the order can have preclusive effect under the circumstances in this case.

2. A similar dispute exists regarding the August 17, 2017 order from the Circuit Court of Rankin County dismissing what appear to be identical claims in a suit UMB Bank filed against Stonebridge. State Ct. Order [172-2]. Stonebridge argues that UMB Bank should not receive a "second bite at the apple"—a clear reference to preclusion—but it offers no legal analysis to support its position. Stonebridge Mem. [173] at 1. UMB Bank says Stonebridge is wrong, but its memoranda also omit substantive legal analysis of collateral estoppel and/or res judicata, other than a footnote regarding the receivership claim. *See* UMB Bank Combined Reply [180] at 12 n.5.

- o   The Court previously noted that "all parties must eventually address collateral estoppel and/or res judicata." Order [101] at 22. Those doctrines may or may not impact the breach-of-contract claims against Stonebridge as to conduct that

7

      occurred either before or after the state-court order. As noted above, the Rankin County Circuit Court must have concluded that UMB Bank's breach-of-contract claims accrued more than three years before the 2010 amended complaint in that case, which could impact arguments in this case regarding claims for conduct occurring after the state-court decision. This alone counsels against granting UMB Bank's motion.

- o Stonebridge contends that UMB Bank alleged no conduct after 2009—which is untrue—and, perhaps alternatively, that nothing after that date is now actionable. Specifically, it contends that UMB Bank's continuing-breach argument fails because Stonebridge is not making a statute-of-limitations argument and is instead saying the state court has already ruled. Stonebridge provides little context, but if its argument circles back to preclusion issues, it was again offered with no helpful legal analysis. As with the Minnesota ruling, the Court has not independently researched the elements of collateral estoppel and/or res judicata as applied to these alleged facts.[3]

- o Assuming both the Minnesota and Mississippi orders carry preclusive effect, the parties will need to explain how they are reconciled.

3. Stonebridge argues that the Trustee (then Bank of the Ozarks) breached section 5.01 of the Trust Indenture in 2009 when it decided to withhold funds it was obligated to pay; absent these funds, Stonebridge lacked the ability to perform its duties.

- o It is unclear whether the Trustee repudiated its duties as Stonebridge alleges, and, if so, when. To begin, Stonebridge cites a 2009 email from Shelia Mayden, an agent for Bank of the Ozarks, as the first sign of breach. *See* Stonebridge Mem. [172] at 4. According to Stonebridge, "[i]n the email[,] Ms. Mayden indicated that the Trustee would not provide any funding for the salary of the Stonebridge manager." *Id.*

    - First, that mischaracterizes what Mayden said. Her email states, "[T]he funds for the manager will need to come from sources *other* than the *special assessments*." Mayden Email [172-6] at 2 (emphasis added). She did not say the Trustee would provide no funding.

---

[3] The Court was in a similar position when it allowed UMB Bank to bring breach-of-contract claims against Stonebridge. At the time, the Court had not seen the state-court record, so it did not know whether Stonebridge was a party to UMB Bank's earlier suit. Order [101] at 24. It also concluded that Green Hills and Dell Group (who opposed the motion to join Stonebridge as a party) had not articulated why preclusion would apply to events allegedly occurring after the state-court order. *Id.* Again, that issue must be directly addressed.

8

- Second, stating that the manager would have to be paid from "sources other than the special assessments" does not suggest that the Trustee breached section 5.01 as Stonebridge alleges. *Id.* That section addresses an account funded by "proceeds from the Bonds issued." Trust Indenture [166-1] § 5.01. And section 6.03 indicates that special assessments are to be initially deposited in the Revenue Fund.

- Third, Green Hills filed a memorandum opposing UMB Bank's summary-judgment motion in which it argues that, under the Trust Indenture, Stonebridge "has the right to receive money only through receipt of the Maintenance Special Assessments." Green Hills Mem. [176] at 2. The Trust Indenture states that "'Special Assessments' shall not include 'maintenance special assessments,' if any, levied and collected by the Issuer [Stonebridge]." Trust Indenture [166-1] at 9. Stonebridge seems to disagree with Green Hills's construction, stating that the "special assessments fund the debt service and the operating fund for Stonebridge." Stonebridge Mem. [173] at 7 n.2. On this record, Stonebridge has not shown that Mayden's statement regarding payment to the manager from "special assessments" was incorrect.

- Fourth, even assuming Mayden's email addressed section 5.01 as Stonebridge asserts, the parties have not discussed whether such an oral statement could alter the contract terms or constitute breach.

o Aside from the Mayden email, Jeff Goodwin, then President of the Board of Directors for Stonebridge, states in his declaration that UMB Bank told him Stonebridge would receive no funding from the Trustee. Goodwin Decl. [172-4] ¶ 11. UMB Bank did not dispute this alleged fact—focusing instead on larger issues—but the Court does not know when that statement allegedly occurred or whether it could legally alter the parties' duties.

o Stonebridge offers two pieces of correspondence from Craig Wrathell, whose firm was hired as manager in 2009. The first is an email from Wrathell seeking information from Bank of the Ozarks that Wrathell needed to comply with certain non-monetary obligations under the Trust Indenture. *See* Wrathell Email [172-6] at 1. The second is Wrathell's resignation letter in which he states that since being retained, "we have been unable to get any assistance from the Trustee to allow this firm to successfully step in and do our job." Wrathell Letter [172-9] at 1. UMB Bank has not directly addressed these factual allegations suggesting that its conduct prevented Stonebridge's retained manager from satisfying the non-monetary obligations UMB Bank says Stonebridge breached.

9

- UMB Bank claims that, under section 5.01 of the Trust Indenture, it was not required to pay costs because the section states that costs "*may* be paid as set forth herein." UMB Bank Combined Reply [180] at 4 (quoting Trust Indenture § 5.01). Stonebridge never addresses this argument, but there are other provisions addressing funding.

- The parties dispute whether "costs," as defined in section 1.01 of the Trust Indenture, includes "operating costs" of the sort that Stonebridge says it needed to perform the contractual duties UMB Bank claims it breached. Though the Court has studied the cited sections from the Trust Indenture, it remains unclear whether those sections mean the Trustee was obligated to pay those specific costs.

- And under section 19-31-23(11) of the Mississippi Code, costs of the project may be paid "out of the proceeds of bonds," which is different from special assessments. But section 19-31-23(14) goes on to say that "[n]othing in this chapter shall be construed to authorize the district to utilize bond proceeds to fund the ongoing operations of the district." The parties have not sufficiently addressed the extent to which the operating expenses Stonebridge says the Trustee should have funded actually qualify as costs of the project under the Trust Indenture or Mississippi law.

- More fundamentally, the Court wonders how Stonebridge was to finance the duties UMB Bank says it breached if the Trustee had no duty to provide the necessary funds as UMB Bank argues.

    - According to Stonebridge, under section 6.01 of the Trust Indenture, Stonebridge was to collect the special assessments and forward "part of the special assessments on to the trustee for bond debt service." Stonebridge Reply [214] at 5. But in early 2009, neither party followed that requirement because the county began sending funds directly to the Trustee. *Id.* Stonebridge did not support the assertion with a cite to record evidence.

    - Green Hills makes a similar factual argument and, as noted above, contends that Stonebridge should have been paid from maintenance special assessments. Green Hills Mem. [176] at 2. But like Stonebridge, Green Hills cites no record evidence to support its factual assertion, stating instead that it is "undisputed." *Id.*

    - Though Stonebridge and Green Hills failed to cite record evidence regarding their assertions about the collection history, UMB Bank does not dispute them. Nor does it explain the significance. Moreover, there is no cited record evidence suggesting that Stonebridge actually assessed maintenance special assessments.

10

- o UMB Bank alternatively says that, if a duty existed, no breach occurred because Stonebridge failed to submit requisition forms as section 5.01(b) of the Trust Indenture requires. *See* UMB Bank Combined Reply [180] at 5. Stonebridge never addresses this potentially dispositive argument (assuming no preclusion). But again, Jeff Goodwin states in his declaration that "any such requests would be pointless as UMB would provide no funds of any sort to Stonebridge." Goodwin Decl. [172-4] ¶ 11. Goodwin's declaration is ambiguous regarding the timing of the alleged statement and whether Stonebridge had complied with the requisition-form requirement before he was given that message. In other words, did the Trustee really breach first? And neither party addresses the legal significance—if any—of such oral amendments to the Trust Indenture or what appears to be a futility argument.

- o Stonebridge never adequately accounts for UMB Bank's argument that a party to a contract cannot utilize the first-breach defense to performance without repudiating the contract. *See* UMB Bank Combined Reply [180] 7–8; Stonebridge Reply [214] at 6–8.

- o Stonebridge states that the Trustee's breaches coupled with the 2014 Forbearance Agreement prevented special assessments from being collected that could satisfy its obligations under the Trust Indenture. Indeed, it argues that performance was "impossible." Stonebridge Mem. [173] at 8.

    - Impossibility and impracticability are two narrow defenses to an alleged breach. *See generally* 3A MS Prac. Encyclopedia MS Law § 21:57 (3d ed.). But if that is what Stonebridge argued, it provided neither legal authority nor analysis.

    - For its part, UMB Bank did not address the impact of the Forbearance Agreement in its memoranda.

- o UMB Bank says any alleged breaches on its part—which are denied—would be immaterial because the Trust Indenture defines the events of default, and the Trustees' alleged acts are not included. UMB Bank Combined Reply [180] at 6. UMB Bank cited no authority for categorically limiting all breaches to the enumerated events of default. And, given section 10.01's text, it is unclear how the Trustee could be in breach. Regardless, it is not apparent that breach and default are coterminous, and "[m]ateriality is ordinarily a question of fact, . . . albeit one of ultimate fact, not evidentiary fact." *UHS-Qualicare, Inc. v. Gulf Coast Comm. Hosp., Inc.*, 525 So. 2d 746, 756 (Miss. 1987).

4. While Stonebridge does not necessarily dispute that it failed in its monetary duties, Turnage has argued that, under the Trust Indenture, Stonebridge was obligated to pay only what was collected as special assessments. Turnage Mem. [177] at 3 (citing Trust Indenture [166-1] § 9.07).

5. UMB Bank also contends that Stonebridge breached certain non-monetary obligations in the Trust Indenture. Section 10.01(e) suggests that the failure to perform such covenants constitutes default (which UMB Bank equates to breach) only when "such default continues for sixty (60) days after written notice requiring the same to be remedied." Consistent with that, UMB Bank states that Stonebridge violated non-monetary duties "*despite notices* requesting compliance." UMB Bank Mem. [165] at 14 (emphasis added) (citing Glender Decl. [164-2] ¶¶ 8–10); *see also* UMB Mem. [167] at 9 (citing Glender Decl. [166-2] ¶ 10 for argument that Stonebridge breached after notice). But the cited paragraphs from the Glender Declaration never mention notice, and UMB Bank did not offer the written notices as an exhibit.[4]

6. Finally, as to the Continuing Disclosure Agreement, Stonebridge says it lacked resources to comply and that the claim is precluded. But aside from that, the Court is not clear regarding the Trustee's role as the "dissemination agent" under that agreement. Continuing Disclosure Agreement [164-6] § 7.

Considering these open questions, the better course is to take all counterclaims related to Stonebridge's alleged breaches of contract to trial, including the counterclaims for bad faith and for a writ of mandamus. *Kunin*, 69 F.3d at 62.

    B.    Motion for Receiver

The next question is whether the Court may and/or should appoint a receiver. Article X of the Trust Indenture is entitled Events of Default and Remedies, and section 10.12 provides that in the event of default, "[t]he Trustee shall be entitled as of right to the appointment of a receiver." Trust Indenture [166-1] at 45. There appears to be no dispute that events of default have occurred, even if UMB Bank has not yet established—as a matter of law—that it should

---

[4] Turnage argues that Glender's declaration should be stricken. Turnage Mem. [177] at 4–5. But under Uniform Local Civil Rule 7(b)(3), Turnage may not make a motion in the body of a responding legal memorandum, so that argument is disregarded. Even if considered, the arguments are not well taken.

12

prevail on its claim for breach of contract against Stonebridge. But the Court will deny this motion without prejudice.

UMB Bank offers a strong argument for appointing a receiver under Mississippi law. But because it invokes Federal Rule of Civil Procedure 66, it is unclear whether Mississippi law applies. "[T]he clear language of Rule 66 specifies that the Federal Rules of Civil Procedure 'govern an action in which the appointment of a receiver is sought or a receiver sues or is sued.'" *Midwest Bank v. Goldsmith*, 467 F. Supp. 3d 242, 247 (M.D. Pa. 2020) (quoting Fed. R. Civ. P. 66) (applying federal law to motion to appoint receiver despite contractual choice-of-law provision). District courts within the Fifth Circuit, and several federal appellate courts, "have held that '[t]he appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles.'" *Morgan Stanley Smith Barney LLC v. Johnson*, 952 F.3d 978, 980 (8th Cir. 2020) (quoting *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993)); *accord Can. Life Assur. Co. v. LaPeter*, 563 F.3d 837, 843 (9th Cir. 2009); *Nat'l P'Ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998); *U.S. Bank Nat'l Ass'n v. Lakeview Retail Prop. Owner LLC*, No. 1:15-CV-404-LG-RHW, 2016 WL 2599145, at *1 (S.D. Miss. May 5, 2016) (quoting *World Fuel Servs. Corp. v. Moorehead*, 229 F. Supp. 2d 584, 596 (N.D. Tex. 2002)).

The parties will need to address whether state or federal law applies to UMB Bank's request for a receiver because the standards under the federal rule and Mississippi law are not the same. Under Mississippi law, a party seeking the appointment of a receiver must show

> first, either that he has a clear right to the property itself; or that he has some lien upon it; or that the property constitutes a special fund to which he has a right to resort, for the satisfaction of his claim. And secondly, that the possession of the property by the defendant was obtained by fraud; or that the property itself, or the income arising from it, is in danger of loss from the neglect, waste, misconduct or insolvency of the defendant.

*Clark v. Fleming*, 94 So. 458, 460 (Miss. 1923); *see also Spectrum Oil, LLC v. West*, 34 So. 3d 1213, 1220 (Miss. Ct. App. 2010) ("A receivership is a remedy where the court takes possession of the assets of the entity placed in receivership through a court-appointed receiver.").

Under federal law, the Court considers six factors in deciding whether to appoint a receiver:

> a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm.

*Santibanez v. Weir McMahon & Co.*, 105 F.3d 234, 241–42 (5th Cir. 1997) (quoting *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316–17 (8th Cir. 1993)); *see also Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) ("Receivership . . . is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties.").

If federal law applies, the motion gives the Court little practical guidance on things like the scope of the receiver's responsibilities and the costs, which could impact whether the benefits of a receivership outweigh the burdens.  *See Netsphere*, 703 F.3d at 311 ("When a receivership is proper, the general rule is that the receivership fees and expenses 'are a charge upon the property administered.'" (quoting *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994))).  Nor is there information on the other considerations under federal law.

Finally, while the Court denies this motion without prejudice, it is not persuaded by Stonebridge's three primary defenses:  (1) waiver, (2) immunity, and (3) *expressio unius*.  First, Stonebridge says UMB Bank waived its request for a receiver when its amended complaint in the Rankin County Circuit Court case dropped its previous demand for a receiver.  "Waiver is the

intentional relinquishment of a known right; 'to establish a waiver, there must be shown an act or omission on the part of the one charged with the waiver fairly evidencing an intention permanently to surrender the right alleged to have been waived.'" *Am. Nat'l Prop. & Cas. Co. v. Estate of Farese*, 530 F. Supp. 3d 655, 669 (S.D. Miss. 2021) (quoting *Taranto Amusement Co., Inc. v. Mitchell Assocs. Inc.*, 820 So. 2d 726, 729–30 (Miss. Ct. App. 2002)). While UMB Bank may have waived the appointment of a receiver in the Rankin County case, Stonebridge has not made a compelling argument that dropping a remedy in a separate suit forever waives that remedy in subsequent litigation.

Second, Stonebridge claims immunity under Mississippi law. Specifically, Stonebridge says it is a political subdivision of the state entitled to sovereign immunity and notes that "statutes in derogation of sovereignty should be strictly construed in favor of the State so that its sovereignty may be upheld, and not narrowed or destroyed except by specific provisions." *City of Jackson v. Miss. State Bldg. Comm'n*, 350 So. 2d 63, 64 (Miss. 1977). The Court is not convinced. First, section 19-31-17 gives Stonebridge express powers, including the power to "make and execute contracts" and to "sue and be sued." Miss. Code Ann. § 19-31-17(e), (a). UMB Bank persuasively argues that taking these and other provisions together, the statutory scheme "reflect[s] a clear legislative policy allowing [Stonebridge] to enter and then be bound by contracts that allow for appointment of a receiver." Combined Reply [180] at 12; *see Gulfside Casino P'ship v. Miss. State Port Auth. at Gulfport*, 757 So. 2d 250, 256 (Miss. 2000) ("The general rule is that when the legislature authorizes the State's entry into a contract, the State necessarily waives its immunity from suit for a breach of contract.") (quoting *Cig Contractors, Inc. v. Miss. State Bldg. Comm'n*, 399 So. 2d 1352, 1355 (Miss. 1981)).

15

Finally, the *expressio unius* canon of statutory construction does not preclude a receivership. Stonebridge contends that since "nothing in the [Public Improvement District] Act provides for the appointment of a receiver for a public improvement district," the Court may not order one. Stonebridge Mem. [175] at 8; *see also* Turnage Mem. [177] at 7 (quoting *Jones-Smith v. Safeway Ins. Co.*, 174 So. 3d 240, 247 (Miss. 2015) (Kitchens, J., dissenting) ("A common rule of statutory construction is *expressio unius est exclusion alterius*, or 'expression of the one is exclusion of the other.'")). "But the *expressio unius* canon is not meant to be mechanically applied." *In re Bourgeois*, 902 F.3d 446, 447 (5th Cir. 2018). It "applies only when 'circumstances support[] a sensible inference that the term left out must have been meant to be excluded.'" *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002)). Here, the Public Improvement District Act does not list specific remedies for breaches, so there is no inference that receiverships are precluded by exclusion.

Because it appears that a different legal standard may apply, and the parties have not addressed it, UMB Bank's motion for summary judgment on the claim for receivership and its emergency motion to appoint a receiver are both denied without prejudice. Both sides should have an opportunity to address whether state or federal standards apply and then argue them.

C.     Rule 56(d) Motion and the Civil-Conspiracy Claim

Finally, Counter-Plaintiffs ask the Court to defer ruling on Stonebridge's summary-judgment motion as to the civil-conspiracy count while discovery remains ongoing. *See* Fed. R. Civ. P 56(d) (allowing Court to "defer considering the motion or deny it" where summary-judgment nonmovant shows "it cannot prevent facts essential to justify its opposition"). In their motion, they detail the discovery that was outstanding when the summary-judgment motion was

16

filed and the facts they expect to flesh out in that discovery relevant to the motion.  *See* Fortenberry Decl. [203-1].

"Rule 56(d) motions for additional discovery are broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Am. Fam. Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)) (internal quotation marks omitted).  Given that there remains an outstanding discovery motion, Mot. [218], and that the Court has denied summary judgment on the other claims, the Court exercises its discretion to deny the summary-judgment motion as to the civil-conspiracy claim under Rule 56(d)(1).

III.   Conclusion

The Court has considered all arguments.  Those not addressed would not have changed the outcome.  As stated, UMB Bank's Motion for Partial Summary Judgment [164] and Motion to Appoint Receiver [166], as well as Stonebridge's Motion for Summary Judgment [182] are all denied.  Counter-Plaintiffs' Motion to Defer [203] is granted.

**SO ORDERED AND ADJUDGED** this the 9th day of February, 2022.

s/ *Daniel P. Jordan III*<br>CHIEF UNITED STATES DISTRICT JUDGE